UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JOHN McCRAY,

                              Plaintiff,

              v.

MTA METRO-NORTH RAILROAD,

                              Defendant.

---

No. 24-CV-01150 (KMK)

OPINION & ORDER

Appearances:

Steven L. Barkan, Esq.
Melville, NY
*Counsel for Plaintiff*

Alan Muraidekh, Esq.
Metro-North Commuter Railroad
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

John McCray ("Plaintiff") brings this suit against the Metro-North Railroad Company ("Defendant" or "Metro-North") alleging negligent infliction of emotional distress and intentional infliction of emotional distress under the Federal Employers' Liability Act, stemming from an incident at Metro-North's Croton Harmon facility in 2021.  (*See* Compl. (Dkt. No. 1).) Before the Court is Defendant's Motion for Summary Judgment.  (*See* Def.'s Mot. for Summ. J. (Dkt. No. 22).)  Because facts that are not in genuine dispute show Defendant's agent did not act negligently or intentionally inflict emotional distress on Plaintiff as a matter of law, the Court grants the Motion.

I.  Background

A.  Factual Background

The following is drawn from facts that are not in genuine dispute unless indicated otherwise.[1]  Plaintiff has worked for the Metro-North Railroad since 1992, starting as a coach cleaner and advancing to a machinist in 1994.  (Affirmation of Alan Muraidekh in Supp. of Mot. for Summ. J. ("Muraidekh Aff.") Ex. D ("Pl. Dep."), at 15 (Dkt. No. 25).)  He has worked as a machinist there since.  (*Id.*)  At the time of the events described in the Complaint, Plaintiff was stationed at the Metro-North's facility in Croton Harmon and was working the 12:00am to 8:00am shift.  (*Id.* at 17.)

Plaintiff was on duty at the Croton Harmon facility on the night shift on March 14, 2021.  (Def.'s Rule 56.1 Statement ¶ 5 ("Def.'s Rule 56.1") (Dkt. No. 23).)  That evening, the MTA Police and one of its officers, Ross Shaw, "were dispatched to Croton Harmon" in response to "a harassment complaint as against a Metro-North employee," Francis Muthig, who had allegedly "sent threatening text messages to another Metro-North employee threatening to kill him."  (*Id.* ¶ 6–7.)  While searching the area "to locate the offender" who allegedly had made those threats, Officer Shaw and Walter Dinsmore,[2] a General Foreman working at the facility who accompanied Officer Shaw on his search, came upon a locked, occupied restroom.  (*Id.* ¶ 8.)

---

[1] Only Defendant complied with Local Civil Rule 56.1 and this Court's Individual Rule II(D).  Plaintiff did not respond to and "specifically den[y] and controvert[] by a correspondingly numbered paragraph" each paragraph in Defendant's 56.1 statement.  Local Civ. R. 56.1(c).  The Court is accordingly entitled to "deem to be admitted for purposes of the motion" each item in Defendant's 56.1 statement but will still construe those facts in the light most favorable to Plaintiff, the non-movant.  *Id.*; *see Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").

[2] Plaintiff's deposition and Complaint both refer to the Foreman as "Denymore."  The Court uses the "Dinsmore" spelling that appears with more frequency in other documents in this record.

They determined the restroom was locked by "jiggl[ing] the handle." (Muraidekh Aff., Ex. E ("Dinsmore Dep.") at 27 (Dkt. 25).) Unbeknownst to Officer Shaw and Foreman Dinsmore at the time, (*id.* at 28), Plaintiff was inside, (*id.* at 23).

Foreman Dinsmore and Officer Shaw "knocked on the door multiple times," and Foreman Dinsmore "requested the occupant . . . to identify himself," (Def.'s Rule 56.1 ¶ 10 (Dkt. No. 23)), but Plaintiff refused to do so, repeatedly saying only that "someone is in there using the bathroom" or otherwise indicating the restroom was occupied. (Pl. Dep. 32 (Dkt. No. 25).) Foreman Dinsmore "identified [him]self by title" and gave his name to Plaintiff. (Dinsmore Dep. 27 (Dkt. No. 25).) After Plaintiff continued not to identify himself, Officer Shaw also identified himself by name and title and stated that he was there on a police matter. (Dinsmore Dep. 29–30 (Dkt. No. 25).) At his deposition, Plaintiff testified that while he recognized Foreman Dinsmore's voice and heard Officer Shaw identify himself as MTA Police, he "thought guys were playing around on the door, banging on the [restroom] door" as a practical joke against him, and "didn't think that [it] was important" to respond with his own name. (Pl. Dep. 32–34 (Dkt. No. 25).) Plaintiff testified that in total, he was asked "around five" times to identify himself, and did not identify himself in response to any of the requests. (*Id.* at 34.)

Officer Shaw then asked Foreman Dinsmore if he had a way to open the restroom door from outside, and Foreman Dinsmore responded that he carried a key that could open the door. (Dinsmore Dep. 32 (Dkt. No. 25).) Officer Shaw asked Foreman Dinsmore for the key so that he could confirm the occupant was not the employee who had made the death threat. (*Id.*) Foreman Dinsmore gave him the key. (*Id.*) Officer Shaw then opened the bathroom door. (*Id.*)

From here, "there is a question as to [what occurred][3] after the bathroom door was opened." (Pl.'s Mem. in Opp. to Def's Mot. for Summ. J. 6 (Dkt. No. 28).) Plaintiff's (the non-movant's) account is as follows. Officer Shaw, "upon finding out that [Plaintiff] wasn't the person he was looking for," "exploded," "calling [Plaintiff] the 'N' word" while standing "with his hand on a holstered pistol." (Decl. of Steven L. Barkan in Opp. To Mot. for Summ. J. ("Barkan Decl.") Ex. 1 ("Pl. Affidavit"), at 1–2 (Dkt. No. 27).) During his outburst, Officer Shaw was standing "[a] couple of feet" from Plaintiff, who was still seated on the toilet. (Pl. Dep. 54 (Dkt. No. 25).) Foreman Dinsmore "was yelling something" at the same time, but Plaintiff does not say what. (Pl. Affidavit 2 (Dkt. No. 27).)

Officer Shaw and Foreman Dinsmore then "turned around," "slammed the door closed," and continued on their search for the alleged harasser. (*Id.*) During the interaction Officer Shaw did not draw his weapon or point it at Plaintiff. (Pl. Dep. 82 (Dkt. No. 25).)

Following this incident, Plaintiff became "so upset that" he "called [his] boss," "told him what happened," then "went home and to the hospital." (Pl. Affidavit 2 (Dkt. No. 27).) Plaintiff did not return to work until January 2022. (Pl. Dep. 107 (Dkt. No. 25).) "[T]o this day, [Plaintiff] still experience[s] fear and anxiety because of this incident," (Pl. Affidavit 2 (Dkt. No. 27)), including post-traumatic stress disorder, (Pl. Dep. 87 (Dkt. No. 25).). Plaintiff does not argue he suffered, and has not shown facts that would establish, any physical injury manifesting from the episode.

---

[3] This is the Court's best guess as to what the brief meant by "butter curd after the bathroom door was opened." (Pl.'s Mem. in Opp. to Def's Mot. for Summ. J. 6 (Dkt. No. 28).) To the extent the Court has misconstrued some unfamiliar idiom, it begs Counsel's forgiveness. And to the extent this is one of the many typographical errors in both parties' briefs, the Court merely notes this for future reference.

### B. Procedural History

Plaintiff filed his Complaint on February 16, 2024, alleging a count of negligent infliction of emotional distress and a count of intentional infliction of emotional distress under the Federal Employers' Liability Act against Metro-North for the actions of Foreman Dinsmore. (*See* Compl. (Dkt. No. 1).[4]) Defendant answered on April 23, 2024. (*See* Ans. (Dkt. No. 7).) After discovery, Defendant moved for summary judgment on April 3, 2025, attaching Foreman Dinsmore's deposition, Plaintiff's deposition, and the MTA Police's police report from the evening. (*See* Mot. for Summ. J.[5] (Dkt. No. 23).) Plaintiff responded on April 25, 2025, attaching an excerpt from the MTA's safety policies and Plaintiff's affidavit. (*See* Response in Opp. to Mot. for Summ. J. (Dkt. No. 29).) Defendant replied on May 7, 2025. (*See* Reply Mem. of L. in Supp. of Mot. for Summ. J. (Dkt. No. 30).)

## II. Discussion

### A. Standard of Review

#### 1. Summary Judgment Standard

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (same); *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In deciding whether to award summary judgment, the court must construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Torcivia v.*

---

[4] The Complaint ostensibly lists three counts, but the first is simply a recitation of the facts and background.

[5] While tagged on the docket as a motion to dismiss, the document at Dkt. No. 22 is a motion for summary judgment, and the Court refers to it as such in this Opinion.

*Suffolk Cnty.*, 17 F.4th 342, 354 (2d Cir. 2021); *see also Horror Inc. v. Miller*, 15 F.4th 232, 240 (2d Cir. 2021) (same).  "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Red Pocket, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 17-CV-5670, 2020 WL 838279, at *4 (S.D.N.Y. Feb. 20, 2020) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the non[-]movant's claim," in which case "the non[-]moving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration adopted, citation and quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. Cnty. of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .").

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental*

*Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted).  At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims."  *Geneva Pharms. Tech. Corp. v. Barr Laby's. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex*, 477 U.S. at 323–24).

When ruling on a motion for summary judgment, a district court should consider only evidence that would be admissible at trial.  *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998).  "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'"  *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)); *see also Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988) ("Rule 56 requires a motion for summary judgment to be supported with affidavits based on personal knowledge . . . ."); *Baity v. Kralik*, 51 F. Supp. 3d 414, 419–21 (S.D.N.Y. 2014) (disregarding "statements not based on [the] [p]laintiff's personal knowledge"); *Flaherty v. Filardi*, No. 03-CV-2167, 2007 WL 163112, at *5 (S.D.N.Y. Jan. 24, 2007) ("The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." (citation omitted)).

### 2.  Claims Brought Under FELA

The Federal Employers' Liability Act ("FELA") is a "broad remedial statute whose objective is to provide a federal remedy for railroad workers who suffer personal injuries as a result of the negligence of their employer."  *Greene v. Long Island R.R.*, 280 F.3d 224, 229 (2d

Cir. 2002) (internal quotation marks omitted).  FELA provides that "[e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier[.]"  45 U.S.C. § 51.

The elements of a negligence claim under FELA are the same as under the common law. *See Norfolk S. Ry. Co. v. Sorrell*, 549 U.S. 158, 165–66 (2007) ("Absent express language to the contrary, the elements of a FELA claim are determined by reference to the common law."); *Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 87 (2d Cir. 2006) ("In FELA actions, the plaintiff must prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation.") (citation omitted).  But "in comparison to tort litigation at common law, a relaxed standard of causation applies under FELA," and a plaintiff need only show "that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought."  *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692 (2011) (internal citation and quotation marks omitted).  "[N]umerous appellate courts, including [the Second Circuit], have construed [FELA], in light of its broad remedial nature, as creating a relaxed standard for negligence as well as causation."  *Ulfik v. Metro-North Commuter R.R.*, 77 F.3d 54, 58 n.1 (2d Cir. 1996) (citation omitted); *see Pierce v. S. Pac. Transp. Co.*, 823 F.2d 1366, 1370 (9th Cir. 1987) ("A reviewing court must uphold a verdict even if it finds only 'slight' or 'minimal' facts to support a jury's finding of negligence.").  "Congress [also] did away with several common-law tort defenses" to negligence when passing FELA "to further FELA's humanitarian purpose;" accordingly, "the statute abolished the fellow servant rule, rejected the doctrine of contributory negligence in favor of that of comparative negligence, and prohibited employers from exempting themselves from FELA through contract," and "abolished

the assumption of risk defense." *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 542–43 (1994) (citation omitted).

Because "as part of [a railroad]'s duty to use reasonable care in furnishing its employees with a safe place to work, a railroad has a duty under FELA to avoid subjecting its workers to negligently inflicted emotional injury," the Supreme Court has held that "claims for damages for negligent infliction of emotional distress [NIED] are cognizable under FELA." *Id.* at 550 (internal citations and quotation marks omitted).  But considering "FELA's central focus on *physical* perils," the Supreme Court holds NIED claims to the "zone of danger test," *id.* at 555 (emphasis added), which "limits recovery for emotional injury to those plaintiffs who sustain a physical impact as a result of a defendant's negligent conduct, or who are placed in an immediate risk of physical harm by that conduct." *Id.* at 547–48.

FELA can be a vehicle for intentional tort claims in two scenarios.  First, "[u]nder FELA, liability for the intentional torts of an employee whose tortious acts are committed within the scope of employment will be imputed to the employer under the doctrine of *respondeat superior* but no liability attaches when the employee acts entirely upon his own impulse, for his own amusement, and for no purpose of or benefit to the defendant employer." *Higgins v. Metro-North R.R. Co.*, 318 F.3d 422, 426 (2d Cir. 2003) (internal citations and quotation marks omitted).  "The second means of holding an employer liable for intentional conduct . . . is to show that the employer was negligent," for example, in hiring or supervising the employee whose conduct is at issue. *Id.* This includes claims for intentional infliction of emotional distress. *Id.* at 425 ("[C]laims of intentional infliction of emotional distress can be brought under FELA.").

B.  Analysis

1.  Negligent Infliction of Emotional Distress Under FELA

To prevail on his negligent infliction of emotional distress claim, Plaintiff must both prove Defendant's negligence—duty, breach, foreseeability or causation, and injury—and show that he was in the zone of danger.  His claim fails as a matter of law because facts as to which there is no genuine dispute show Defendant's employee Foreman Dinsmore did not breach a duty to control Officer Shaw (if such a duty existed), and show Plaintiff was not placed in the zone of danger by Foreman Dinsmore's conduct—that is, allowing Officer Shaw to unlock the door to the restroom and not intervening during Officer Shaw's outburst.[6]

Under FELA, Defendant owed Plaintiff a duty to provide a reasonably safe workplace. (*See* Def.'s Mem. of L. in Supp. of Mot. for Summ. J. 7 (Dkt. No. 24).)  *See Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 558 (1987) ("A railroad has a duty to use reasonable care in furnishing its employees with a safe place to work.  That duty was recognized at common

---

[6] This claim turns on whether *General Foreman Dinsmore* was negligent.  Officer Shaw's conduct is not at issue, except to the extent Foreman Dinsmore can be held responsible for it, because Plaintiff is suing the Metro-North Railroad, not the MTA Police.  Both entities are subsidiaries of the MTA, but the Police are not a subsidiary of the Metro-North Railroad, and Plaintiff provides no evidence that would allow this Court to conclude Officer Shaw was acting as an agent of the Metro-North Railroad.  *See Bush v. Metro-North Commuter R.R.*, 552 F. Supp. 3d 298, 301 (D. Conn. 2021) ("The MTA operates its own police force, including for its subsidiary corporations such as Metro-North."); *id.* at 307 ("[T]here are no facts in the record establishing that Metro-North exercises—or has the ability to exercise—control over MTA police officers."); *id.* at 306–07 (concluding where plaintiff had not alleged MTA Police were acting pursuant to a contract with the Metro-North, and there were no facts on the record that a MTA Police officer was acting as an agent of Metro-North, plaintiff could not sue the MTA under FELA for the officer's negligence); *see also Richardson v. Doe*, No. 21-CV-6042, 2021 WL 5594640, at *1 n.2 (E.D.N.Y. Nov. 30, 2021) ("The LIRR [Metro-North's eastward-bound cousin] is part of the MTA and the police officers are part of the MTA Police.").  It is important to clarify this case does *not* involve any claims against *Officer Shaw* or the MTA Police for any constitutional foul or common-law tort.

law [and] is given force through [FELA.]" (internal citations omitted)).  Foreman Dinsmore, by virtue of his position at the facility, also had the duty to "address and correct any safety issues that may arise during the course of a work shift." (Muraidekh Aff. ¶ 20 (Dkt. No. 25).)  "Under FELA, 'an employer breaches its duty to provide a safe workplace when it knows or should know of a potential hazard in the workplace, yet fails to exercise reasonable care to inform and protect its employees.'" *Vaspasiano v. Metro-North R.R. Co.*, 638 F. Supp. 3d 141, 151 (D. Conn. 2022) (quoting *Gallose v. Long Island R.R. Co.*, 878 F.2d 80, 84–85 (2d Cir. 1989)). Plaintiff argues Defendant breached its duty because Foreman Dinsmore "fail[ed] to prevent [Officer Shaw's] harassment and outrageous conduct," (Compl. ¶ 26 (Dkt. No. 1)), and did not "protect [Plaintiff] from an irate aggressively acting police officer" or "restrain the police officer," (Pl.'s Mem. of L. in Opp. to Def.'s Mot. for Summ. J. 1 (Dkt. No. 28)), who made Plaintiff feel unsafe.

But on this record, Foreman Dinsmore's duty to keep a safe workplace could not possibly have extended to restraining a police officer who was not under his control, nor even under the Metro-North's control, *see supra* note 6, and whom there is no evidence Foreman Dinsmore could control.  "While . . . negligence for [FELA's] purposes is a federal question . . . this federal question generally turns on principles of common law . . . subject to such qualifications as Congress has imported . . . . Thus, [unless] common law principles . . . are expressly rejected in the text of the statute, they are entitled to great weight[.]" *Gottshall*, 512 U.S. at 544.  One principle that has not been "expressly rejected in the text of" FELA, *id.*, is that defendants are generally not under a duty to control the conduct of third persons.[7]  *See* Restatement (Second) of

---

[7] Defendant's references to the conclusions of *Higgins*, which concerned misconduct of other employees at the railroad towards the plaintiff in that case, accordingly do not dictate the result

Torts § 315 ("There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives the other a right to protection."); *Guest v. Hansen*, 603 F.3d 15, 21–22 (2d Cir. 2010) (holding under New York law "a defendant has no duty to control the conduct of third persons so as to prevent them from harming others, even where as a practical matter defendant can exercise such control." (internal quotation marks and citation omitted)).

No fact in the record suggests a "special relation" between Officer Shaw and Foreman Dinsmore, much less *any* relation, that would entitle Foreman Dinsmore to control Officer Shaw's actions or obligate him to do so on Plaintiff's behalf. *See supra* note 6. Nor does the record allow an inference that any "special relation" between Foreman Dinsmore and Plaintiff creates a duty to protect Plaintiff from third persons in addition to Foreman Dinsmore's duty to protect him from ordinary workplace hazards, although this question is closer. Employment relationships *do* generally give rise to such a special relation, *see Doe v. Doe*, 213 N.Y.S.3d 875, 881 (Sup. Ct. 2024), but that rule is not etched in stone, *see, e.g.*, *Goldwater v. Metro-North Commuter R.R.*, 906 F. Supp. 173, 177 (S.D.N.Y. 1995) ("The fact that [Plaintiff] happened also to be a Metro-North employee does not create a duty on the part of Metro-North to give her more protection than it does to the commuting public."), *vacated in part on other grounds*, 101 F.3d 296 (2d Cir. 1996); *Walls v. Krasdale Foods, Inc.*, 697 N.Y.S.2d 612, 612 (App. Div. 1999) ("Nor, even if proven, would plaintiff's status as a special employee of defendant have given rise

---

here—this is not a *respondeat superior* case stemming from Officer Shaw's conduct. 318 F.3d at 428.

to a duty on defendant's part to protect him from the acts of a third party, such as his assailant, beyond defendant's authority and control.") (citation omitted).  Courts in the FELA context have found a duty to control unaffiliated third persons when something more than FELA's generalized duty to maintain a safe workplace is present—for example, where a policy of the railroad imposed such an obligation, setting the standard of care.  *See, e.g.*, *Brown v. Baltimore & Ohio R. Co.*, 805 F.2d 1133, 1137 (4th Cir. 1986) (holding a jury could find a railroad negligent for a third party's placement of heavy equipment on the tracks, causing a crash, because the railroad had "specifically charge[d] its engineers to keep 'a vigilant lookout in the direction moving'"). No fact on the record here points to such a duty—Plaintiff only attaches the page of Defendant's policies obligating Foreman Dinsmore to be "responsible for the safety of employees under [his] jurisdiction," and the enumerated "safety responsibilities" following that broad obligation do not indicate a duty to monitor third persons.  (Barkan Decl. Ex. 2,[8] at 1 (Dkt. No. 27).)  Plaintiff otherwise offers no evidence nor makes any effort to explain why Foreman Dinsmore would have been under a duty to control third persons for Plaintiff's benefit in this case.

But even if the Court could conclude from the record that Foreman Dinsmore did have a duty to protect Plaintiff from third persons, his failure to "restrain" Officer Shaw would not have breached it, and that is sufficient to find he did not negligently inflict emotional distress on Plaintiff.  The negligence standard requires only that Foreman Dinsmore act reasonably, not that he eliminate all possible sources of Plaintiff's emotional distress.  *See Van Gorder v. Grand Trunk W. R.R., Co.*, 509 F.3d 265, 269 (6th Cir. 2007) ("Under FELA, a railroad has a duty to provide its employees with a reasonably safe workplace; this does not mean that a railroad has

---

[8] Although tagged as "Exhibit 1," this is the second exhibit in Plaintiff's filing and the Court refers to it thus.

the duty to eliminate all workplace dangers, but only has the 'duty of exercising reasonable care to that end.'" (quoting *Baltimore & Ohio S.W. R. Co. v. Carroll*, 280 U.S. 491, 496 (1930))). And uncontested facts here show clearly that Foreman Dinsmore acted reasonably to keep the workplace safe throughout the evening—he called the police when a threat arose to the life of a railroad employee, (Dinsmore Dep. 14 (Dkt. 25)), he accompanied the police as they searched the facility for that threat, (*id.* at 15–16), he repeatedly identified himself to Plaintiff when he came upon a locked restroom in which Officer Shaw suspected the employee who had made the threat could be hiding, (*id.* at 27), and he provided Officer Shaw the key to the restroom when Plaintiff repeatedly refused to identify himself or open the door, (*id.* at 32), giving further credence to Officer Shaw's suspicion (particularly given Foreman Dinsmore's testimony that he did not recognize Plaintiff's voice, (*id.* at 29)). There was accordingly no negligence in Foreman Dinsmore allowing Officer Shaw to unlock and open the bathroom. And Plaintiff introduces not one fact into the record indicating Foreman Dinsmore *could* have intervened to stop Officer Shaw's outburst, or suggesting what Foreman Dinsmore would have done. *See Purdy v. Pub. Adm'r of Westchester Cnty.*, 526 N.E.2d 4, 8 (N.Y. 1988) ("[T]here exist special circumstances in which there is *sufficient authority and ability* to control the conduct of third persons that we have identified a duty to do so." (emphasis added)). Finding a duty on civilians to "restrain" police officers acting negligently, as Plaintiff urges, would yield dangerous results. If the cost of a duty exceeds the probability-discounted gravity of the injury, then a defendant cannot be held to that duty. *See generally United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947) (Hand, J.). That is the case here—expecting workplace supervisors to intervene in police encounters would surely risk everyone's safety with a low probability of success, and that expected cost would outweigh the uncertain risk of, in this case, emotional harm that might come

14

from failing to do so.  *Cf. Rasmussen v. City of New York*, 766 F. Supp. 2d 399, 404 (E.D.N.Y. 2011) ("If we are to trust the law to protect citizens from excessive police force, we cannot inconsistently rely on citizens to take matters into their own hands and unilaterally determine when their intervention against the police is appropriate.").

Finally, the record is clear that Plaintiff was not in the zone of danger, a strict limit on claims for negligent infliction of emotional distress after *Gottshall*.  Plaintiff's opposition does not contest Defendant's argument that Plaintiff was not placed in the zone of danger, (*see* Def.'s Mem. of L. in Supp. of Mot. for Summ. J. 13–16 (Dkt. No. 24)), nor does the concept surface in his Complaint, (*see generally* Pl.'s Mem. of L. in Opp. to Def.'s Mot. for Summ. J. (Dkt. No. 28); Compl. (Dkt. No. 1)).  Drawing inferences in Plaintiff's favor, Plaintiff may be arguing Officer Shaw's hand on his holstered service weapon while shouting put Plaintiff in the zone of danger.  (*See* Pl. Dep. 84 (Dkt. 25) ("Q: And the only reason you feel that you were harassed was because of what the police officer told you and because he had his hand on his holster, that's it, right? A: That's more than enough. Q: But that's the total reason . . . [y]ou felt threatened and you felt your life was in danger? A: Yes.").)  But this is categorically different from the cases where, in the FELA context, the Supreme Court has identified a zone of danger where there was "threatened physical contact that caused, or might have caused, immediate traumatic harm."  *See Metro-North Commuter R.R. Co. v. Buckley*, 521 U.S. 424, 430–31 (1997) (collecting cases with the following examples: "car accident," "gas explosion," "train struck car," "clothing caught in escalator choked victim," "car accident" (again), "intruder assaulted plaintiff's husband," "train accident," "near streetcar collision," "car accident" (a third time), "rock from blasting crashed through plaintiffs' residence," "streetcar collision," "train narrowly missed plaintiff," "train collision," "automobile struck carriage," and "car accident" (a fourth time) (citations omitted));

*id.* 432 ("Those within the zone of danger of physical impact should be able to recover for fright because a near miss may be as frightening as a direct hit." (parenthetically quoting R.N. Pearson, *Liability to Bystanders for Negligently Inflicted Emotional Harm—A Comment on the Nature of Arbitrary Rules*, 34 Fla. L. Rev. 477, 488–489 (1982))).  Officer Shaw's hand on a holstered weapon—which Plaintiff agrees remained holstered throughout the incident and was neither removed nor pointed at him—is too attenuated from the immediacy of the "near miss" that characterizes these zone of danger cases.  And Plaintiff's subjective "fear" of danger is not sufficient to show he was, in fact, *in* the zone of danger.  (Pl. Dep. 84 (Dkt. 25).)  *See Barlette v. Consol. Rail Corp.*, No. 92-CV-251S, 1994 WL 721342, at *3 (W.D.N.Y. Dec. 6, 1994) ("The common-law zone of danger rule requires more than just a reasonable belief or fear of physical harm.").  Finally, the *defendant* must put the "danger" in the zone of danger— here, assuming Plaintiff *was* in an immediate risk of harm, it is undisputed that Officer Shaw, *not* Foreman Dinsmore, was the one with his hand on a holstered weapon during the encounter, and accordingly whose spur-of-the-moment conduct would have put Plaintiff in the zone of danger.  (*See* Def.'s Rule 56.1 ¶¶ 16–17 (Dkt. No. 23).)  *See Stacy v. Rederiet Otto Danielsen, A.S.*, 609 F.3d 1033, 1035 (9th Cir. 2010) ("Under [*Gottshall*'s zone of danger] test . . . a tort is committed by a defendant subjecting a plaintiff to emotional harm within 'the zone of danger' created *by the conduct of the defendant*." (emphasis added)).

Accordingly, because there is no genuine dispute that Defendant breached no duty to Plaintiff to control Officer Shaw, and because Plaintiff was not in the "zone of danger" as the Supreme Court has articulated that standard, the Court grants summary judgment on Plaintiff's count of negligent infliction of emotional distress.

2.  Intentional Infliction of Emotional Distress Under FELA

To avoid summary judgment on his intentional infliction of emotional distress ("IIED") claim, Plaintiff must show there is a genuine dispute of material fact that Foreman Dinsmore committed IIED, and either that Dinsmore's IIED can be imputed to Defendant under *respondeat superior* or that Defendant negligently hired or supervised Dinsmore.  (Plaintiff does not argue Officer Shaw's conduct can be imputed to the Metro-North—nor could he, because Officer Shaw does not have an employment or agency relationship with Metro-North.  *See Higgins*, 318 F.3d at 426.)  Because the record shows Foreman Dinsmore's conduct was not extreme or outrageous, summary judgment must be granted on this count as well.

Intentional infliction of emotional distress in New York "has four elements: (i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress."  *Howell v. New York Post Co., Inc.*, 612 N.E.2d 699, 702 (N.Y. 1993).  "In practice, courts have tended to focus on the outrageousness element, the one most susceptible to determination as a matter of law."  *Id.*; *see also* Restatement (Second) of Torts § 46 ("Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.").

The record here shows as a matter of law that Foreman Dinsmore did not intentionally inflict emotional distress by opening the door for Officer Shaw and merely failing to "restrain" him as Officer Shaw shouted at Plaintiff.[9]  The Court begins and ends with the first element.  As discussed above, undisputed facts in the record show *Foreman Dinsmore's* conduct was

---

[9] To be clear, and accepting as true Plaintiff's allegation about the incident, there is no excuse whatsoever for the type of racially insensitive language Officer Shaw used in speaking with Plaintiff after Officer Shaw opened the bathroom door.

17

reasonable under the circumstances—a far cry from "extreme and outrageous"—even if in Plaintiff's account Officer Shaw, whom Plaintiff is *not* suing, did not so conduct himself.  Nor is there any evidence in the record that Foreman Dinsmore either intended to cause Plaintiff severe emotional distress or disregarded a substantial probability of doing so.  Rather, the only evidence going to Foreman Dinsmore's intent or state of mind—which Plaintiff does not contest in his opposition or other materials—is that he intended to accompany Officer Shaw on a search of the facilities for an active threat to an employee's life and gave Officer Shaw the key to allow him to open the restroom to assist in that search, only after Plaintiff refused to identify himself or otherwise cooperate with the time-sensitive investigation.  (Def.'s Rule 56.1 ¶¶ 9–11, 14 (Dkt. No. 23); Dinsmore Dep. 15–16 (Dkt. 25).)

Because facts that are not in genuine dispute show Plaintiff cannot prove the first or second element of intentional infliction of emotional distress, the Court grants summary judgment to Defendant on that count of Plaintiff's Complaint.

### III.  Conclusion

Accordingly, the Court grants summary judgment to Defendant on each count of Plaintiff's Complaint.  The Clerk of Court is respectfully directed to terminate the pending motion (Dkt. No. 22), enter judgment for Defendant, and close this case.

SO ORDERED.

DATED:      February 25, 2026
            White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE